McCarthy et ux. *v.* Pittsburgh et al., Appellants.

400

Argued May 4, 1937.

Before KELLER, P. J., CUNNINGHAM, BALD-
RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Anne X. Alpern,* First Ass't City Solicitor, with her
*John J. Kennedy,* City Solicitor, and *Bennett Rodgers,*
Ass't City Solicitor, for City appellant.

*H. W. McIntosh, Thomas F. Garrahan* and *John H.
Musgrave,* for Musgrave, appellant.

*Morris G. Levy,* of *Levy & Crone,* for appellees.

OPINION BY BALDRIGE, J., July 15, 1937:
These appeals are from judgments obtained by hus-
band and wife for injuries suffered by the wife in a fall
on the sidewalk. Suit was brought against the city of
Pittsburgh, which caused to be issued a writ of scire

facias, bringing upon the record Elmina McEwen Musgrave, the owner of the property in front of which the injuries were sustained.

The jury rendered verdicts of $1,500 for the wife and $1,000 for the husband against the city of Pittsburgh, with liability over against Elmina Musgrave.

On May 30, 1935, between 9 and 10 o'clock p. m., D.S.T., the wife-plaintiff was walking on the eastern sidewalk of Seneca street, which she had not formerly travelled. When she was in front of the Musgrave property, at a point 2 or 3 feet from the curb, her foot "went into a hole" and she was thrown to the ground. She arose and saw her right foot "beside this hole or gutter." She was unable to see the depression as the night was dark and misty and the nearest street lamp, which was at Forbes street, 120 feet distant, did not, under the weather conditions, furnish light to aid in seeing the condition of the pavement.

Seneca street has a descending grade of 7.6 degrees toward Forbes street, which plaintiffs were approaching. Part of the construction of the cement sidewalk was a gutter which ran diagonally from the rainspout attached to the Musgrave house to the curb line. It was a wide-angled "V" with sloping sides and trowel or bevelled edges, 10 feet 6 inches in length and, according to the testimony of the husband-plaintiff, varied in width from 6 to 10 inches and in depth 3 to 5 inches. In the argument before us, and in the brief, appellants assumed that the depression 2 feet from the curb was but 1¾ inches, the figure given by Stocker, their engineer. The trial judge, in his opinion overruling the motion for judgment n.o.v., stated that he felt constrained to disregard McCarthy's testimony respecting the dimensions of the gutter and to accept those of Stocker "as he had measured the depth." So had McCarthy; his figures were not based on a conjectural estimate or guess, as in *McIntyre v. City of Pittsburgh*, 238 Pa. 524, 86 A. 300,

and *Wright v. Pittsburgh Rwys. Co.*, 320 Pa. 40, 181 A. 476. He was formerly a plumber, now engaged in house repairing. The morning after the accident he measured the depression by placing a stick across the gutter and by using a rule to get its exact depth at the point where his wife fell. To be sure, he was not an engineer with technical training, but he evidently had experience in making measurements of this general character, so that his testimony relating to the gutter was entitled to consideration by the jury.

Keeping in mind that a municipality is not an insurer of the absolute safety of pedestrians using its sidewalks, that every depression or irregularity does not serve to charge it with liability, and that the standard of care to which a city is held in the maintenance of its sidewalks is one of reasonable safety *(Williams v. Kozlowski et ux.*, 313 Pa. 219, 223, 169 A. 148; *McGlinn v. Phila. et al.*, 322 Pa. 478, 186 A. 747), was the proof sufficient to support the verdicts?

No definite rule can be laid down stating what irregularities in the surface of a sidewalk constitute a breach of duty upon the part of a municipality or property owner. All gutters across sidewalks are not necessarily illegal; each case depends upon its own facts and circumstances. In some, the depression or irregularity is so slight that the courts have very properly held that the evidence was insufficient to submit the question of negligence to the jury. In others—for example, *Gillard v. City of Chester*, 212 Pa. 338, 61 A. 929; *Shafer v. Phila.*, 60 Pa. Superior Ct. 256; *Ponti v. Phila.*, 63 Pa. Superior Ct. 428; *Glatfelter v. Boro. of North York*, 85 Pa. Superior Ct. 353; *Kuntz v. Pgh.*, 123 Pa. Superior Ct. 394, 187 A. 287, where the irregularities or depressions in the sidewalks varied from 1½ inches to 4 inches —a recovery was permitted.

This case differs from *Burns v. City of Pgh.*, 320 Pa. 92, 181 A. 487, as there a number of depressions were

present in the sidewalk and plaintiff failed to describe or locate definitely the depression that caused her to fall.

We have examined also *King v. Thompson et ux.*, 87 Pa. 365; *Reed v. Tarentum Boro.*, 213 Pa. 357, 62 A. 928; *Newell v. City of Pgh.*, 279 Pa. 202, 123 A. 768; *McGlinn v. City of Phila. et al.*, supra, and other cases called to our attention by the appellants. Without attempting to point out their distinguishing features, it is sufficient to state that the facts therein are not analogous to those in the case at bar. Therefore, they are not controlling.

While this case, in our judgment, is fairly close, we think it cannot be said, as a matter of law, that the appellants discharged their full duty of maintaining this sidewalk in a reasonably safe condition for use of the public by night as well as by day. That was a question of fact. There was no proof offered that the gutter was a common or approved method of construction used by the city for carrying off surface water. The photographs submitted in evidence show two other waterspouts attached to houses on this same street without gutters across the pavement. The tendency, undoubtedly, is to get away from these surface gutters. This is indicated by the Act of Assembly, approved June 7, 1901, P. L. 493 (53 PS §2551 et seq.), the title of which states: "...... and prescribing certain rules, regulations and requirements for the construction of plumbing, house drainage, ...... in cities of the second class ......" Section 20 thereof (53 PS §2578) provides that all buildings shall be kept provided with metallic leaders, for conducting water from the roofs, and in no case shall the water therefrom be allowed to flow on the sidewalk but shall be conducted by a pipe or pipes to the sewer, and if there is no sewer in the street, then it shall be conducted by proper pipe or pipes below the surface of the sidewalk to the street gutter.

We find no merit in the appellants' contention that the cause of Mrs. McCarthy's injuries was not adequately proven. True, she mentioned falling into "a hole," but she also definitely referred to the gutter, which was the only depression existing. The jury had the benefit of photographs of the pavement and gutter and were taken to the scene of the accident where they had an opportunity to observe its depth and the other physical conditions. It was made very clear just where and how Mrs. McCarthy sustained her injuries. Indeed, it is hard to conceive how more information could have been given the jury respecting this gutter.

The appellants ask that, if the judgment is not reversed, a new trial be granted, owing to a divergence of medical testimony produced by plaintiffs.

Dr. Walters, plaintiffs' family physician, testified that he examined Mrs. McCarthy immediately after the accident and found her in a dazed condition, with lacerations on her body, brush marks on both knees, swollen right ankle, bruised forehead; that she complained of pain in her neck and back; that he prescribed certain treatment and gave her sedatives for the pain. She was confined to her bed from that time until she was removed to the hospital on the 13th of July, where, the following day, she gave birth to a child. On August 1st she was able to go to his office, but complained of her back, right ankle, nervousness, and that her weight had rapidly increased from 165 to 205 pounds, which the witness attributed to a disturbance of the glands. There was further testimony that owing to the soreness and pain in her back, which permitted but limited motion and was not improving, and her nervous condition, she had great difficulty in doing housework. His testimony as to the cause of her increased weight was stricken out at the end of plaintiffs' case.

Dr. Blumer confined his examination made September 25, 1935, to Mrs. McCarthy's back. He stated that

she had a pain localized over the right sacroiliac area, radiating down the sciatic nerve, which he attributed to the accident. He expressed the opinion that this condition would remain permanent unless she were hospitalized and placed in a plaster jacket from 6 to 8 weeks; but he said this treatment was attended with difficulty due to her corpulency. He advised her against attempting to do any type of work as that would aggravate her condition.

Dr. Baer, also called by plaintiffs, testified that he examined Mrs. McCarthy on May 27, 1936, and that, in his opinion, her increased weight was due to some derangement of the pituitary gland, which resulted from the nervous shock she received when she fell, and that her condition would be permanent.

The defendants called Dr. Schleiter, who stated that a gain in weight may accompany an underfunctioning of the thyroid gland, but it is not usually excessive, and it did not "seem" to him that Mrs. McCarthy's increased weight was attributable to a disorder of the thyroid or any other gland. He said also that "there are a great many disorders that are referable to the pituitary gland," including a gain in weight, but he personally knew of no case of a pituitary gland disorder being caused by an accident.

Dr. McMeans, also called by defendants, made an examination of Mrs. McCarthy on May 16, 1936, when she complained of discomfort in her back and tenderness in her right hip and other parts of her body, swelling of her ankle, headaches, etc. She mentioned particularly the increase in her weight, and he found in his examination that she was "moderately obese." His conclusion was that the condition of her nervous system and muscles, the pains she experienced, etc., were not the result of a trauma. He was not asked by defendants' counsel for an opinion, nor did he express one as to the cause of her increased weight. He said, however, that

there is a type of obesity which is associated with a disfunctioning of the pituitary gland. He did not definitely classify her, although she had "a fatty fulness" as one having a true pituitary disfunctioning. When plaintiffs' counsel attempted to cross-examine Dr. McMeans concerning Mrs. McCarthy's increased weight, an objection was sustained that it was not proper cross-examination. Plaintiffs then elected to call Dr. McMeans as their own witness, and he then testified that, in his opinion, her obesity was not caused by the disfunctioning of the pituitary gland, nor otherwise attributable to the accident.

The appellants argue that Dr. McMeans, when testifying for plaintiffs, contradicted Dr. Baer, and therefore, under the ruling of *Mudano v. Phila. Rapid Transit Co.*, 289 Pa. 51, 137 A. 104, the trial judge should have sustained their third point, to the effect that the jury should not consider a gain of weight in arriving at the measure of damages. In that case, more than 16 months after an accident an ulcer formed on plaintiff's heel which had been fractured. He sought to recover damages not only for the original fracture but also for the results of the ulcer. In order to establish a causal connection between the fractured heel and the ulcer, the plaintiff called two physicians, one of whom testified that the ulcer probably resulted from his shoe rubbing his heel, causing a blister which became infected. The other expert testified that, in his opinion, the infection resulted from the accident.

In the case at bar, the plaintiffs made out their case without any conflict of testimony. There can be no doubt that the extent of Mrs. McCarthy's injuries, including her increase in weight, was, at the close of plaintiffs' case, a question for the jury's consideration. Without determining the correctness of the court in sustaining the objection to the cross-examination, as that question is not before us, we think the testimony

of Dr. McMeans, when the plaintiffs made him their witness after he was originally sworn as defendants' witness, should not be regarded in the same light or given the same effect as the testimony offered by plaintiff in the Mudano Case, as, there, the plaintiff's prima facie case depended upon conflicting testimony. Disregarding the claim for Mrs. McCarthy's increase in weight, we think the proof of her other injuries justified the verdicts.

A careful consideration of this entire case fails to convince us that the lower court committed any error that requires a retrial of it.

Judgments are affirmed.